190 P.3d 74 (2008)
In re the DETENTION of Joel S. REIMER, Petitioner.
No. 35242-7-II.
Court of Appeals of Washington, Division 2.
July 29, 2008.
*76 Darrel S. Ammons Jr., Attorney at Law PLLC, Longview, WA, for Petitioner.
Jodi Lynn Crawford, Attorney General of Washington, Todd Richard Bowers, Attorney General-CJD, Seattle, WA, for Respondent.
PENOYAR, J.
¶ 1 Joel Reimer appeals the trial court's decision denying his request for an evidentiary hearing to determine whether he currently meets the definition of a sexually violent predator. The State cross assigns error to the trial court's ruling that RCW 71.09.090, as amended in 2005, is unconstitutional. Reimer failed to present evidence that his condition has changed so that he no longer is a "sexually violent predator" under either former or amended RCW 71.09.090. We affirm the trial court on this issue but reverse the trial court's ruling that the amended statute is unconstitutional.

FACTS
¶ 2 In 1982, at the age of thirteen, Reimer committed his first sexual offense against a seven-year-old boy. After Reimer was convicted of indecent liberties, he was committed to the Department of Juvenile Rehabilitation for sixty-five weeks. In 1985, at the age of *77 sixteen, Reimer was arrested and pleaded guilty to first degree rape and second degree assault after sexually assaulting a thirteen-year-old boy.[1] After his release at the age of twenty-one, Reimer became sexually involved with a twelve-year-old girl and impregnated her. Reimer was subsequently convicted of third degree child molestation.
¶ 3 In 1992, after completing his sentence for third degree child molestation, Reimer was involuntarily civilly committed to the care and custody of the Department of Social and Health Services (DSHS) at the Special Commitment Center (SCC) as a sexually violent predator (SVP).[2] Reimer has remained in DSHS's custody since 1992. He has refused to participate in treatment while at the SCC.
¶ 4 In November 2002, the trial court entered an order allowing Reimer to obtain a mental health evaluation by his own expert under RCW 71.09.070.[3] In March 2003, Reimer's evaluation was submitted to the trial court. On May 9, 2005, the legislature amended RCW 71.09.090; the amendments took effect immediately.[4] On January 20, 2006, the trial court conducted a show cause hearing for continued commitment pursuant to RCW 71.09.090. The State relied on annual reviews conducted from 2002 through 2005 in support of its position that Reimer continued to meet the definition of an SVP, that conditional release to a proposed less restrictive alternative (LRA) would not be in Reimer's best interest, and that conditions could not be imposed that would adequately protect the community. Reimer relied on two reports submitted by Dr. Lee Coleman, a licensed psychiatrist, in an effort to establish probable cause that his condition had changed so that he no longer met the definition of an SVP. Reimer also argued that the 2005 amendments to RCW 71.09.090 were unconstitutional.
¶ 5 The trial court ruled that the 2005 amendments to RCW 71.09.090 were unconstitutional on the basis that they violated "principles of due process, equal protection of the laws, and the right to a jury trial." Clerk's Papers (CP) at 240. The trial court then proceeded to conduct the show cause hearing using the former RCW 71.09.090 standard.[5] The trial court ruled, however, that the State met its burden of presenting prima facie evidence establishing that Reimer continued to meet the definition of an SVP and that Reimer failed to present sufficient evidence, through Dr. Coleman, that his condition had changed so that a full evidentiary hearing on the issue was warranted. Reimer now appeals the trial court's decision denying his request for an evidentiary hearing. The State cross assigns error to the trial court's ruling that RCW 71.09.090, as amended, is unconstitutional.

ANALYSIS
¶ 6 Reimer appeals the trial court's decision denying his request for an evidentiary hearing to determine whether he currently meets the definition of an SVP. Because *78 Reimer failed to present evidence establishing that probable cause existed to believe that his condition had changed so that he no longer met the definition of an SVP under either the former or the amended RCW 71.09.090, we affirm. However, we reverse the trial court's ruling that the amended statute is unconstitutional.

I. RCW 71.09.090
¶ 7 RCW 71.09.090 sets forth the procedures by which an SVP may be released from custody. RCW 71.09.090(2)(a) provides for a show cause hearing to determine whether probable cause exists to warrant a hearing on whether the committed person's condition has so changed that:
(i) He or she no longer meets the definition of [an SVP]; or (ii) conditional release to a proposed [LRA] would be in the best interest of the person and conditions can be imposed that would adequately protect the community.
A show cause hearing is required unless waived. RCW 71.09.090(2)(a). If the trial court at the show cause hearing determines that either (1) the State has failed to present prima facie evidence that the committed person continues to meet the definition of an SVP, and that no proposed LRA is in the best interest of the person and conditions cannot be imposed that would adequately protect the community, or (2) probable cause exists to believe that the person's condition has so changed that the person no longer meets the definition of an SVP, or release to a proposed LRA would be in the best interest of the person and conditions can be imposed that would adequately protect the community, then the trial court is required to set a hearing on either or both of these issues. RCW 71.09.090(2)(c). Subsection (3) of the statute governs such hearings.[6]See RCW 71.09.090(3)(a)-(c).
¶ 8 In May 2005, the legislature amended RCW 71.09.090, clarifying its intent regarding the "so changed" language in the statute.[7]See S.B. 5582, 59th Leg., Reg. Sess. (Wash.2005), effective May 9, 2005. The legislature added subsection (4) to the statute, which provides:
(4)(a) Probable cause exists to believe that a person's condition has "so changed" under subsection (2) of this section, only when evidence exists, since the person's last commitment trial proceeding, of a substantial change in the person's physical or mental condition such that the person either no longer meets the definition of [an SVP] or that a conditional release to a[LRA] is in the person's best interest and conditions can be imposed to adequately protect the community.
(b) A new trial proceeding under subsection (3) of this section may be ordered, or held, only when there is current evidence from a licensed professional of one of the following and the evidence presents a change in condition since the person's last commitment trial proceedings:
(i) An identified physiological change to the person, such as paralysis, stroke, or dementia, that renders the committed person unable to commit a sexually violent *79 act and this change is permanent; or
(ii) A change in the person's mental condition brought about through positive response to continuing participation in treatment which indicates that the person meets the standard for conditional release to a[LRA] or that the person would be safe to be at large if unconditionally released from commitment.
(c) For purposes of this section, a change in a single demographic factor, without more, does not establish probable cause for a new trial proceeding under subsection (3) of this section. As used in this section, a single demographic factor includes, but is not limited to, a change in the chronological age, marital status, or gender of the committed person.
RCW 71.09.090(4)(a)-(c) (emphasis added). In amending the statute, the legislature emphasized, among other things, its intent that civil commitment pursuant to chapter 71.09 RCW address the "very long-term" treatment needs of the SVP population. S.B. 5582, § 1. Furthermore, the legislature discussed its concern that recent court decisions had subverted "the statutory focus on treatment," and reiterated the importance of "prolonged treatment in a secure facility followed by intensive community supervision [only] in the cases where positive treatment gains are sufficient for community safety." S.B. 5582, § 1.
¶ 9 Recently, in In Re Detention of Fox, 138 Wash.App. 374, 387-88, 158 P.3d 69 (2007),[8] we explained:
In the findings accompanying its amendment to the SVP act, the legislature documented that RCW 71.09.090 provides a mechanism for an SVP to demonstrate a change in his condition, potentially justifying reconsideration of continuing commitment, rather than an opportunity to attack his original SVP commitment collaterally. Laws of 2005, ch. 344, § 1. The legislature. specifically cited court decisions In re Detention of Young, 120 Wash.App. 753, 86 P.3d 810, review denied, 152 Wash.2d 1035, 103 P.3d 201 (2004) and In re Detention of Ward, 125 Wash.App. 381, 104 P.3d 747, review denied, 155 Wash.2d 1025, 126 P.3d 820 (2005), as misapplications of its legislative intent in defining the "so changed" language triggering a full evidentiary hearing under RCW 71.09.090. Laws of 2005, ch. 344, § 1.
(Footnotes omitted).[9]

II. Burden of Proof and Standard of Review
¶ 10 There are two statutory avenues for a trial court to find probable cause for an evidentiary hearing: (1) by deficiency in the State's proof or (2) by sufficiency of the respondent's proof. See In re Det. of Petersen, 145 Wash.2d 789, 798, 42 P.3d 952 (2002). The State's burden of proof is satisfied if it presents prima facie evidence that (1) the committed person's condition has not changed sufficiently and he therefore continues to meet the definition of an SVP, and (2) any proposed LRA placement is not in the best interest of the committed person and conditions cannot be imposed that would adequately protect the community. RCW 71.09.090(2)(b), (c), and (d); see Petersen, 145 Wash.2d at 798, 42 P.3d 952. If the State cannot or does not present this prima facie evidence, then there is probable cause to believe that continued confinement is not warranted and the matter must be set for a full evidentiary hearing at trial. See Petersen, 145 Wash.2d at 798, 42 P.3d 952.
*80 ¶ 11 If the State has satisfied its burden, however, a new trial may be ordered only if the respondent's proof establishes probable cause that the person's condition has so changed that (1) the person no longer meets the definition of an SVP, or (2) release to an LRA would be in the best interests of the person and conditions can be imposed that would adequately protect the community. RCW 71.09.090(2)(c)(ii). The 2005 legislative amendments clarified the statute's "so changed" language, requiring that the respondent present evidence of an identified physiological change that renders the SVP unable to commit a sexually violent act, or a change in the person's mental condition brought about through positive response to continuing treatment which indicated that the person meets the standards for a conditional release to ah LRA or that the person would be safe at large if unconditionally released from commitment. RCW 71.09.090(4). If the respondent makes this showing, then a hearing on one or both of the above issues must be ordered. RCW 71.09.090(2)(c).
¶ 12 We review a trial court's legal conclusion regarding whether the evidence meets this probable cause standard de novo. Fox, 138 Wash.App. at 402, 158 P.3d 69 (citing Petersen, 145 Wash.2d at 799, 42 P.3d 952).

III. CONSTITUTIONALITY OF 2005 AMENDMENTS TO RCW 71.09.090
¶ 13 The State cross assigns error to the trial court's ruling that the 2005 amendments to RCW 71.09.090 are unconstitutional and asks that we review this issue pursuant to RAP 2.4(a). The State asks for review of this ruling because "its repetition on remand would be prejudicial to the State." Resp't's Br. at 8. Because we recently discussed the constitutionality of these amendments in Fox, a case that the trial court did not have the benefit of, we will only briefly address Reimer's constitutional arguments below.
¶ 14 At the trial court, Reimer argued that the amended statute violates (1) due process because the amendments limit the evidence a detainee can present to show that he no longer meets the definition of an SVP; (2) the separation of powers doctrine because the legislature has dictated to the courts what evidence the court will accept as proof regarding the issue of whether a detainee continues to meet the definition of an SVP; (3) equal protection because the amendments have improperly created two classes of detainees, SVPs who have participated in treatment and SVPs who have not participated in treatment; and (4) the right to a jury trial because it deprives detainees of the right to have a jury determine factual issues based on all relevant evidence.[10]
¶ 15 We recently rejected several of these arguments in Fox, 138 Wash.App. 374, 158 P.3d 69. In Fox, three SVPs sought review of trial court orders denying them full evidentiary hearings/SVP recommitment trials. 138 Wash.App. at 380, 158 P.3d 69. We consolidated their cases on appeal. The three SVPs argued that their respective superior courts should have granted their requests for full fact-finding recommitment hearings under chapter 71.09 RCW to consider their present dangerousness and readiness for release because (1) their conditions had changed since their original SVP commitments; (2) their expert actuarial data demonstrated lower risk for them to reoffend; and (3) legislative amendments to the SVP act, denying a new evidentiary hearing when a petitioner alleges a change in only a single *81 demographic factor, violated the separation of powers doctrine and the petitioners' rights to due process and the equal protection of law.[11]Fox, 138 Wash.App. at 380, 158 P.3d 69. We held that the amended statute did not violate the separation of powers doctrine[12] or the petitioners' rights to due process[13] and equal protection of the law,[14] and was therefore constitutional as enacted and as applied to the three SVPs in that case. Fox, 138 Wash.App. at 381, 158 P.3d 69.
¶ 16 In light of our treatment of the SVPs' constitutional challenges in Fox, we reverse the trial court's ruling that the amended RCW 71.09.090 is unconstitutional. We are unconvinced that Reimer's constitutional arguments are legally distinguishable from those asserted in Fox. Furthermore, Reimer was required to show (under both versions of the statute) that probable cause existed to believe that his condition had changed so that he no longer met the definition of an SVP, or that release to a proposed LRA would have been in his best interest and conditions could have been imposed that would adequately protect the community. As discussed below, Reimer failed to establish these things. Thus, we affirm the trial court's ruling denying Reimer a full evidentiary hearing on these issues.

IV. DENIAL OF REIMER'S REQUEST FOR AN EVIDENTIARY HEARING[15]

A. State's Burden of Proof under the Former & Amended RCW 71.09.090
¶ 17 As stated above, the State's burden of proof (under both the former and the current version of RCW 71.09.090) is satisfied if it presents prima facie evidence that (1) the committed person's condition has not changed sufficiently and he therefore continues to meet the definition of an SVP and (2) any proposed LRA placement is not in the best interest of the committed person, and conditions cannot be imposed that would adequately protect the community. RCW 71.09.090(2)(b), (c), and (d). Under the amended statute, the trial court will grant a hearing only when there is current evidence from a licensed professional of one of the following and the evidence presents a change since the person's last commitment trial proceeding: (1) an identified physiological change to the person, such as paralysis, stroke, or dementia, that renders the committed person unable to commit a sexually violent act and this change is permanent; or (2) a change in the person's mental condition brought about through positive responses to continuing participation in treatment which indicates that the person meets the standard for conditional release to an LRA or that the *82 person would be safe to be at large if unconditionally released for commitment. See RCW 71.09.090(4).
¶ 18 At the show cause hearing, the State presented an annual report written in April 2005 by Dr. Carole DeMarco, a psychologist employed by DSHS.[16] In her report, Dr. DeMarco concluded:[17]
It is my professional opinion that Mr. Reimer appears to continue to meet the definition of a sexually violent predator. Mr. Reimer's present mental condition seriously impairs his ability to control his sexually violent behavior. Secondly, it is my professional opinion that Mr. Reimer's condition is such that, at the present time, conditions cannot be imposed that would adequately protect the community, and a less restrictive alternative would not, at the present time, be in his best interest. I do not recommend that the court consider a less restrictive placement for him at this time.
CP at 38. Dr. DeMarco assessed Reimer's current mental condition and psychiatric diagnoses, offense history, past psychiatric diagnoses, treatment progress, and risk factors for future sexual violence in determining whether Reimer continued to meet the definition of an SVP and whether conditional release to an LRA was in his best interest, and conditions could be imposed that would adequately protect the community. She noted, for example, that Reimer is resistant to sex offender specific treatment groups or psychoeducational modules,[18] does not have relapse prevention plans in place to utilize at times when he may become at risk of sexually or physically assaulting others, and has remained in phase one of the six-phase inpatient treatment program because "he has elected to not participate in any specialized sexual deviancy treatment activities while at the [SCC]."[19] CP at 17. Furthermore, Dr. DeMarco noted:
At this time, Mr. Reimer demonstrates risk factors that suggest he is a poor candidate for an [LRA]. Since Mr. Reimer has not participated in treatment, it is [my opinion] that it is not in his best interest to be moved to an [LRA], as it could not provide the intensity of treatment he requires. Additionally, it is not felt that an [LRA] placement is available that could adequately protect the community.
CP at 37. Thus, the State has met its statutory burden of presenting prima facie evidence that (1) Reimer's condition has not changed sufficiently and he therefore continues to meet the definition of an SVP and (2) any proposed LRA placement is not in Reimer's best interest, and conditions cannot be imposed that would adequately protect the community.

B. State's Burden of Proof under Hendricks and Foucha Cases

¶ 19 Reimer argues that under Kansas v. Hendricks, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), and Foucha v. Louisiana, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992), the State is required to show current mental illness and dangerousness in order to continue an SVP's civil commitment. Even if we apply the standard announced in Hendricks and Foucha, however, the State has met its burden.
*83 ¶ 20 The Foucha decision arose from a case in which a hospital review committee recommended that Foucha, an insanity acquitee, be conditionally discharged from a psychiatric hospital. 504 U.S. at 74, 112 S.Ct. 1780. The trial court ruled that Foucha was dangerous to himself and others and ordered that he return to the mental institution. Foucha, 504 U.S. at 75, 112 S.Ct. 1780. The Louisiana Supreme Court affirmed, holding that Foucha had not carried the burden placed upon him by statute to prove that he was not dangerous, and neither the Due Process nor the Equal Protection Clause was violated by the statutory provision permitting confinement of an insanity acquitee based on dangerousness alone. Foucha, 504 U.S. at 75, 112 S.Ct. 1780. The United States Supreme Court granted certiorari and reversed, holding that the State may confine a person only if it shows by clear and convincing evidence that he is both mentally ill and dangerous. Foucha, 504 U.S. at 72, 112 S.Ct. 1780.
¶ 21 In Foucha, the Court seemed to recognize that those who are mentally ill may recover as a result of a variety of factors (which may include participation in treatment), and cannot be indefinitely confined without a showing that they are, in fact, mentally ill. In cases involving an SVP's civil commitment, however, the legislature has specifically recognized the importance of treatment in the rehabilitation of SVPs and the "very long-term needs" of the SVP population. The legislature's findings to this effect are reflected in the amended RCW 71.09.090, which contemplates the possibility of continued confinement given the need for long-term treatment. Thus, we would note that the nature of the civil commitment discussed in Foucha is fundamentally different than that addressed by RCW 71.09.090.
¶ 22 Even if we apply the aforementioned standard, the State has met its burden of showing current mental illness and dangerousness. First, Dr. DeMarco concluded that Reimer currently suffers from (1) Sexual Sadism[20]; (2) Paraphilia, Not Otherwise Specified (Nonconsent)[21]; (3) Pedophilia, Sexually Attracted to Both, Nonexclusive Type (Rule Out)[22]; (3) Alcohol Abuse, In Remission in a Controlled Environment; and (5) Antisocial Personality Disorder (Significant Psychopathy).[23] Dr. DeMarco formulated her diagnostic impressions based on a review of Reimer's records and the information presented at his March 2005 interview. Notably, Dr. DeMarco acknowledged:
Formulating diagnoses in a forensic setting such as the [SCC] poses a number of unique challenges . . . In comparison with other settings in which patients are not civilly detained, there are sometimes more questions about the veracity of the patients' self-report. Civilly committed patients are likely to try to present in the best possible light in order to obtain an [LRA]. Therefore, although a SCC resident's self-report is often a key component in formulating diagnoses, other information is also given considerable weight. This evidence includes . . . diagnoses that have been formulated by other psychologists and psychiatrists. Consistent diagnoses across time from a variety of doctoral-level clinicians are a strong indicator of diagnostic accuracy.
CP at 30-31.
¶ 23 Secondly, Dr. DeMarco considered the *84 actuarial tools and dynamic risk factors[24] commonly used in SVP evaluations and concluded:
This combination of mental abnormalities and personality disorder, in addition to his abuse of alcohol, impairs Mr. Reimer's ability to control his behavior and places him at high risk for sexually violent offenses in the absence of any therapeutic or other intervention.
CP at 37. Thus, the State also met its burden under Hendricks and Foucha, as it presented prima facie evidence that Reimer currently suffers from mental illness and continues to pose a danger to the community.

V. REIMER'S EVIDENCE ESTABLISHING PROBABLE CAUSE

A. Under the Amended Statute
¶ 24 As stated above, an SVP may establish probable cause warranting a full evidentiary hearing either by (1) demonstrating a change in his mental abnormality or personality disorder, or (2) by showing that he is no longer dangerous. Fox, 138 Wash. App. at 402, 158 P.3d 69 (citing Petersen, 145 Wash.2d at 798-99, 42 P.3d 952). Under the amended statute, RCW 71.09.090(4) clarifies that a hearing is appropriate only where there is a substantial change in the person's physical or mental condition. (Emphasis added). This "substantial change" is limited to a permanent physiological change that renders the person unable to commit a sexually violent act or "a change in the person's mental condition brought about through positive response to continuing participation in treatment." RCW 71.09.090(4)(b)(ii) (emphasis added). The evidence Reimer presented failed to establish probable cause under the amended statute.
¶ 25 Dr. Coleman's evaluations of Reimer fail to address whether Reimer's condition has so changed that he no longer meets the definition of an SVP. Furthermore, Dr. Coleman does not assert that Reimer suffers from a physiological change that renders him unable to commit a sexually violent act, or that a change in Reimer's mental condition brought about through positive responses to continuing participation in treatment indicates that Reimer meets the standard for conditional release to an LRA or that he would be safe to be at large if unconditionally released for commitment. Rather, Dr. Coleman devotes a substantial portion of his report to criticizing the methods mental health professionals use to diagnose patients and assess their risk for reoffending, and he seems to focus on the flaws inherent in Reimer's initial diagnoses.
¶ 26 In his first report, which he authored in February 2003, before interviewing Reimer in person, Dr. Coleman began by criticizing Reimer's initial diagnoses when he was evaluated for SVP status in 1991. Dr. Coleman claimed that Reimer's diagnoses of paraphilia and sexual sadism were "simply a restatement of [ ] Reimer's crimes and as such should not be considered as support for SVP status." CP at 263. Dr. Coleman then goes on to explain that "diagnostic conclusions are not reliable predictive tools" and that the evaluations conducted subsequent to Reimer's initial evaluations resulted in labels that were applied "simply because an earlier evaluator applied them." CP at 264, 267.
¶ 27 Dr. Coleman then addressed Reimer's resistance to treatment. He stated:
The fact is that other things Mr. Reimer has been doing, such as taking a leading role in questioning SVP programs, could just as likely indicate significant personal reform. Why haven't any evaluators created a profile of an individual who engages in socially relevant advocacy, thereby increasing self-esteem while lowering the tendency to act-out in socially unacceptable ways? Is there any reason such advocacy might not amount to a sort of "treatment program?"

*85 . . . .
The opinions of [the other evaluators and Reimer's treatment team] are best understood as an ordinary human reaction to Mr. Reimer's rejecting their offers to help, rather than any kind of scientific or objective evaluation.
CP at 266. Finally, Dr. Coleman concluded:
[T]he methods used by prior evaluators all suffer from flaws that stem from the fact that they are searching for a mental disorder that doesn't exist, since it was invented by state legislators; trying to make predictions that are beyond the special skills of mental health professionals; and relying on tools that are flawed and misleading.
CP at 269.
¶ 28 In his second report, which he authored after interviewing Reimer in September 2003, Dr. Coleman acknowledged that Reimer has "no intention" of participating in treatment but argued that "there is absolutely no basis" for making a link between Reimer's unwillingness to participate in treatment and whether he is a continuing danger to society. CP at 175 (emphasis omitted). He then emphasized that "the most influential researcher in this area" has demonstrated that participation in treatment is not a reliable indicator of future recidivism. CP at 175. Finally, Dr. Coleman concluded his report by stating, "I have no doubt that the treatment program can help some inmates, but it is not for everyone, and lack of participation must not be taken to indicate lack of personal reform and readiness for release." CP at 175-76.
¶ 29 Dr. Coleman's reports reveal that he disagrees with Reimer's initial diagnoses and with the legislature's focus on treatment as a reliable predicative factor in determining whether an SVP should be released into the community. As the State argues, Dr. Coleman's reports are rooted in his fundamental disagreement with the statutory criteria that form the basis of Reimer's initial commitment. As we have explained in Fox, "[T]he legislature documented that RCW 71.09.090 provides a mechanism for an SVP to demonstrate a change in his condition . . . rather than an opportunity to attack his original SVP commitment collaterally." 138 Wash. App. at 387-88, 158 P.3d 69. Dr. Coleman's reports offer little to establish that Reimer's condition has changed and seems to go so far as to applaud Reimer for declining to participate in the SCC's treatment program. Thus, because Reimer has failed to demonstrate a change in his mental condition "brought about through positive response to continuing participation in treatment," he is not entitled to an evidentiary hearing on these issues. RCW 71.09.090(4)(b)(ii).

B. Under Former RCW 71.09.090
¶ 30 Former RCW 71.09.090 required Reimer to show that his condition had changed so that he no longer met the definition of an SVP. Ultimately, Dr. Coleman's reports do not provide sufficient evidence that Reimer's condition has changed as required. Rather, they constitute a collateral attack on Reimer's initial diagnoses and focus almost exclusively on the diagnostic procedures followed by the mental health community and on the premise that one's participation in treatment is directly correlated to one's risk for recidivism. This, in itself, is insufficient.
¶ 31 We affirm the trial court' denial of an evidentiary hearing, but reverse the trial court's ruling that the amended statute is unconstitutional.
We concur: VAN DEREN, C.J., and HUNT, J.
NOTES
[1] Reimer was paroled in 1985, and had been out of custody for about two weeks when he committed this sexual offense.
[2] The phrase "sexually violent predator" refers to "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(16).
[3] RCW 71.09.070 provides that an SVP shall have a current examination of his or her mental condition made by DSHS at least once every year and that the annual report must include consideration of whether the committed person currently meets the definition of an SVP and whether conditional release to a less restrictive alternative is in the best interest of the person, and conditions can be imposed that would adequately protect the community:
[4] RCW 71.09.090 sets forth the procedures by which an SVP may be released from custody. We discuss the statute and its amendments at length below.
[5] Former RCW 71.09.090 also required that an SVP establish whether probable cause existed to warrant a hearing by providing evidence that (1) the person's condition had so changed that he or she no longer met the definition of an SVP or (2) conditional release to an LRA would be in the best interest of the person, and conditions could be imposed that would adequately protect the community. See S.B. 5582, 59th Leg., Reg. Sess. (Wash.2005), effective May 9, 2005. We discuss the amendments to this statute below.
[6] The scope of the show cause hearing is limited;

The show cause hearing is in the nature of a summary proceeding wherein the trial court makes a threshold determination of whether there is evidence amounting to probable cause to hold a full hearing. The show cause hearing is an expression of the Legislature's wish that judicial resources not be burdened annually with full evidentiary hearings for [SVPs] absent at least some showing of probable cause to believe such a hearing is necessary.
In re Det. of Petersen, 138 Wash.2d 70, 86, 980 P.2d 1204 (1999).
[7] Before and after May 2005, RCW 71.09.090(2)(c) contained language placing an evidentiary burden on an SVP: "If the court at the show cause hearing determines that either: (i) The state has failed to present prima facie evidence that the committed person continues to meet the definition of [an SVP] and that no proposed [LRA] is in the best interest of the person and conditions cannot be imposed that would adequately protect the community; or (ii) probable cause exists to believe that the person's condition has so changed that: (A) The person no longer meets the definition of [an SVP]; or (B) release to [an LRA] would be in the best interest of the person and conditions can be imposed that would adequately protect the community, then the court shall set a hearing on either or both issues." (Emphasis added); see S.B. 5582, 59th Leg., Reg. Sess. (Wash.2005) (effective May 9, 2005). Thus, under the former statute, Reimer would have still been required to establish probable cause that his condition had "so changed."
[8] The Washington Supreme Court granted review of Fox in February 2008, and remanded for reconsideration in light of its decision in In Re Detention of Elmore, 162 Wash.2d 27, 168 P.3d 1285 (2007). In Elmore, the court determined that the 2005 amendments could not be applied to persons whose show cause/probable cause hearings occurred prior to the effective date of those amendments (May of 2005). The Elmore court did not consider the constitutionality of those amendments and, "as such, the portions of Fox dealing with that issue are untouched by that decision." Resp't's Br. at 13. Our unpublished decision on reconsideration was filed in June 2008.
[9] The State contends that the unintended consequence of Young and Ward was "a proliferation of new commitment trials based solely upon a defense expert's disagreement with the annual review report or the commitment determination of the original finder of fact." Resp't's Br. at 9.
[10] Reimer argues that the amended RCW 71.09.090 "purports to severely restrict the circumstances under which a detainee can have an evidentiary hearing for the determination of whether he continues to meet the definition of [an SVP]." Appellant's Br. at 6. Specifically, Reimer objects that the statute "requires that the detainee be involved in sexual offender treatment before he will be allowed a hearing." Appellant's Br. at 6. Reimer argues that, given the trial court's declaration that the amended RCW 71.09.090 is unconstitutional, Division One's Young and Ward control as precedent in determining whether an SVP is entitled to an evidentiary hearing. As noted above, however, we explained in Fox that the legislature specifically cited Young and Ward as misapplications of its legislative intent in defining the "so changed" language triggering a full evidentiary hearing. 138 Wash.App. at 387, 158 P.3d 69.
[11] Additionally, one of the SVPs argued that the trial court improperly applied the amended RCW 71.09.090 retroactively to him, and another argued that he was entitled to a full evidentiary hearing regardless of the amendment's constitutionality. Fox, 138 Wash.App. at 380, 158 P.3d 69.
[12] [RCW 71.09.090] merely requires that [the SVPs] first produce some evidence showing some change in their mental conditions to demonstrate their progress in SVP treatment . . . [W]e find no separation of powers violation in the manner in which the 2005 SVP act amendments operated to preclude [the SVPs'] requests for new commitment hearings based on their respective failures to produce evidence of changes in their conditions warranting such hearings.

Fox, 138 Wash.App. at 396, 158 P.3d 69.
[13] [T]he legislature amended the statute to clarify that the standard for the probable cause hearing is whether the SVP's condition has so changed as to render him significantly less dangerous to the community than he was at the time of his commitment. Nothing in the statutory amendments prevents the SVP from demonstrating that he has either comported with his behavioral treatment or that he no longer poses a danger to society. Rather, the only change in the statute is the legislature's clarification that a single demographic factor cannot be the only basis for demonstrating that a person's condition has changed enough to lower his danger to the community.

Fox, 138 Wash.App. at 399, 158 P.3d 69.
[14] In response to the SVPs' argument that the amendments created two classes of SVPs  those who engage in SVP treatment and those who do not  we concluded that because the State was furthering dual interests in both protecting the community and treating sex offenders, the amended statute survived rational-basis review. Fox, 138 Wash.App. at 402, 158 P.3d 69.
[15] The State notes, "It is unclear whether Mr. Reimer is arguing the trial court should have granted an evidentiary hearing under former RCW 71.09.090 or under the statute as amended. The State will respond with analysis under both versions of the statute." Resp't's Br. at 1.
[16] The State notes that although the annual review hearing encompassed numerous annual reviews dated January 15, 2002, June 13, 2002, January 31, 2003, December 29, 2003, and April 26, 2005, it focuses on Dr. DeMarco's April 2005 report as it is the most recent. The State explains that "[p]rior evaluators expressed the same expert opinions as Dr. DeMarco did, that Mr. Reimer's condition had not so changed that he no longer met the definition of [an] SVP or that release to an LRA would be in his best interest and conditions could be put in place to adequately protect the community." Resp't's Br. at 4.
[17] In a signed declaration preceding her report, Dr. DeMarco stated, "I hold the opinions contained in my report to a reasonable degree of psychological certainty." CP at 2.
[18] Pyschoeducational modules help residents "learn about the types of sexual attitudes, thought patterns and dysfunctional ways of coping that often lead to offending. [They] also help residents explore and develop more adaptive ways of coping." CP at 37.
[19] Dr. DeMarco also outlined a number of incidents in which Reimer yelled at or refused to comply with orders given by SCC staff.
[20] According to the DSM-IV-TR, sexual sadism is characterized by "recurrent, intense, sexually arousing fantasies, sexual urges, or behaviors involving acts (real, not simulated) in which the psychological or physical suffering (including humiliation) of the victim" is sexually arousing. CP at 31.
[21] SCC residents usually suffer from Paraphilia, which is "a type of mental disorder that involves difficulties with controlling sexual impulses, fantasies, and behavior." CP at 31.
[22] With respect to this diagnosis, Dr. DeMarco noted, "At this point, it continues to be somewhat unclear whether Mr. Reimer continues to be interested in prepubescent children as an adult . . . [I] consulted with [Dr.] Paul Spizman. . . [who] indicated that the diagnosis couldn't be ruled out completely unless Mr. Reimer would consent to plethysmograph and polygraph assessments. . ." CP at 33.
[23] Antisocial Personality Disorder is "a pervasive pattern of disregard and violation of the rights of others occurring since age 15 years," as indicated by, among other things, impulsivity, irritability, aggressiveness, and a reckless disregard for the safety of others. CP at 34.
[24] These tools include the Psychopathy Checklist-Revised (PCL-R), the Sex Offender Risk Appraisal Guide (SORAG), and the Static-99, all of which are considered reliable measures of risk of violent and sexually violent behavior. Dynamic risk factors include, among other things, poor history of interpersonal relationships as demonstrated by volatile reactions to other people, poor impulse control, and negative attitude toward therapeutic intervention.