No. 101,987

STATE OF KANSAS, *Appellee,* v. NATHAN INKELAAR, *Appellant.*

(264 P.3d 81)

Opinion filed October 21, 2011.

*Ryan Eddinger*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: This is a direct appeal from Nathan Inkelaar's convictions for one count of rape, one count of aggravated indecent liberties with a child, one count of attempted aggravated indecent liberties with a child, and three counts of aggravated criminal sodomy. He argues: (1) The trial court erred in allowing the State to introduce K.S.A. 60-455 evidence of prior sexual abuse to show plan, intent, or absence of mistake or accident; (2) the prosecutor committed misconduct during cross-examination of the defendant's brother; (3) the trial court lacked jurisdiction to sentence the defendant under Jessica's Law, K.S.A. 21-4643, because the defendant's age was omitted from the complaint and from the jury instructions; and (4) the trial court abused its discretion by excluding evidence of third-party guilt. We reject his arguments and affirm.

## FACTS AND PROCEDURAL BACKGROUND

Inkelaar's convictions involve two victims, M.C. (a 9-year-old girl) and Z.C. (an 11-year-old boy), who are siblings. The children lived with their father, A.C., and their stepmother, V.C. Inkelaar and A.C. were long-time friends.

Inkelaar would sometimes babysit the children, which included occasions where they would spend the night at Inkelaar's home. On Friday, November 30, 2007, A.C. was preparing to leave town for the weekend, and Inkelaar agreed to let M.C. and Z.C. spend the night at his home. The next afternoon, V.C. called and spoke to the children and Inkelaar by telephone, and Inkelaar asked if

they could spend another night because he was decorating for Christmas. V.C. agreed. Then, on Sunday, December 2, 2007, M.C. called her stepmother and asked to come home. V.C. did not have a car, so she could not go pick up the children. V.C. asked where Inkelaar was, and M.C. said he was still asleep. V.C. told M.C. to wait until Inkelaar woke up and then ask him to bring her home.

Later that afternoon, Inkelaar brought the children home. When M.C. got out of the car, she was wearing a new pair of boots. V.C. was angry at Inkelaar for buying this gift because it was close to Christmas (she had planned to buy the same boots for M.C.) and because she had previously told him to stop spoiling the children with gifts. A.C. had specifically told Inkelaar not to buy the children any shoes because of V.C.'s shopping plans.

That night, after Inkelaar left, V.C. was sitting on the couch with the children when M.C. revealed that Inkelaar made them play "strip Candyland" over the weekend. When V.C. asked her if she knew what "strip" means, M.C. said, "Yeah, you have to take your clothes off." M.C. said both she and Z.C. had to remove clothing during the game, and Inkelaar removed clothing too.

V.C. did not call the police right away because she first wanted to talk to the children's father, who had not yet returned from his trip. When A.C. returned a couple of days later, V.C. told him about M.C.'s allegations. A.C. called law enforcement and reported the suspected child molestation.

Detective Lori Werlein of the Exploited/Missing Children's Unit of the Sedgwick County Sheriff's Department interviewed M.C. and Z.C. Although a DVD and a transcript of the interviews were later admitted into evidence, neither of those exhibits was included in the record on appeal (and it does not appear a request to have them added was ever submitted). The detective's affidavit regarding the substance of the interview is in the appellate record, however, and indicates that M.C. told the detective about the strip Candyland game, that M.C. and Z.C. ended up with no clothing on, and that Inkelaar rubbed his " 'weenie' " on M.C.'s " 'titties and crotch' " and also on Z.C.'s " 'titties and crotch.' " M.C. said

Inkelaar's clothing was off, his " 'weenie' was 'big and hairy,' " and that " 'juice' " came out of it and went on M.C.'s and Z.C.'s skin.

M.C. told the detective that Inkelaar started doing " 'dirty stuff' " to her when she was 5 years old. Inkelaar made her rub his penis when her brother was asleep, and Inkelaar would take a shower with her. He also rubbed M.C.'s " 'booty' " with his " 'weenie.' " M.C. told the detective Inkelaar locked her in the bathroom and made her " 'suck his dick' " and he also " 'sucked [her] crotch.' " M.C. also said Inkelaar took off her clothes and put his mouth on her crotch while she sat on the toilet. She said he stopped because her brother came into the room. Sometimes Inkelaar would make her lick and " 'suck his dog's pussy.' " In the detective's affidavit, she also indicated M.C. told her about Inkelaar making her watch pornography and having " 'dirty magazines' " at his house.

With regard to Z.C.'s interview, the detective's affidavit indicated Z.C. said " 'things' " had been happening to his sister and himself. When asked to explain what he meant by " 'things,' " Z.C. said it was " 'sexual harassment' " and it was not happening as much to him as to his sister. Z.C. told the detective that Inkelaar, with his hands, touched M.C.'s " 'private' " while her pants were off. He also told the detective about the strip Candyland game and indicated they had to take their clothing off and sit on the couch. Z.C. said that Inkelaar touched M.C.'s face with his " 'weenie' " and also put his " 'weenie' " in Z.C.'s face. According to the detective's affidavit, both children indicated Inkelaar "told them not to tell what happened because if they did then he would go to jail."

At trial, M.C. testified Inkelaar touched her "crotch" with his "wiener" and rubbed his "wiener" on Z.C.'s chest during the game of strip Candyland. Z.C. also testified they played strip Candyland. Z.C. said Inkelaar touched his sister's "private" with Inkelaar's finger, Inkelaar's "wienie" was out, and it was "big"; but Z.C. denied Inkelaar touched either child with his "wienie." Z.C. testified that M.C. told him Inkelaar would touch her at night and "make her watch movies and stuff." Z.C. remembered a time when his sister was taking a shower and Inkelaar went into the bathroom with her, but Z.C. denied going into the bathroom himself. Z.C. felt embarrassed when his sister told V.C. about what happened, and that is

why Z.C. did not say anything. Z.C. testified Inkelaar told them not to tell.

In addition to testifying about strip Candyland, M.C. claimed Inkelaar had been inappropriately touching her since she was 4 years old. This happened at Inkelaar's home while her brother was either asleep on the couch or playing outside with friends. According to M.C., Inkelaar touched her "crotch" with his finger and his "wiener." She described this happening when she was sleeping, sitting on the toilet, or taking a shower. Inkelaar also stuck his "wiener" in her "butt" after making her bend over his bed. He made M.C. watch pornographic movies while her brother slept on the couch. M.C. performed oral sex on Inkelaar, who told her, "If you suck my wiener, I'll buy you anything you would want." He also forced M.C. to perform oral sex on a dog and told M.C. if she did not "do it, we won't go to Wal-Mart or get any breakfast." She also indicated Inkelaar "would touch Z.C. on his titties with his wiener." M.C. testified Inkelaar said if she told anybody in her family about these things he was doing, "he would go to jail."

Inkelaar did not testify in his own defense. The jury watched a DVD of Inkelaar's police interview, in which he made statements about the accusations of M.C. and Z.C. As with the interviews of the victims, neither the DVD nor the transcript of Inkelaar's interview was included in the record on appeal. According to Detective Werlein's affidavit and the testimony of Detective William Riddle, Inkelaar was interviewed by Detective Riddle and another detective, Don Story. Detective Riddle could not recall whether Detective Werlein observed the interview from another room. Although Detective Riddle testified at trial, he did not divulge the details of Inkelaar's statements; thus, the trial transcript does not provide those details for this court. Detective Werlein's affidavit, however, contains some particulars about Inkelaar's interview, such as Inkelaar's explanation that on Saturday, December 2, 2007, M.C. and Z.C. started talking about "wanting to play 'Strip Candyland' " and M.C. started trying to take her clothes off. According to Detective Werlein:

"[Inkelaar] stated that he wrestles and tickles with both kids a lot and it's not unusual for them to 'slip' out of their pants or shirts. [Inkelaar] also admitted that

he has gotten an erection during the wrestling, but claims that when that happens he stops the play. [Inkelaar] stated that during the wrestling with the victims he has possibly grabbed private parts of their bodies. When asked about the dog, [Inkelaar] stated that he had never had anyone 'act out a sexual fantasy' with a dog. [Inkelaar] maintained that anything that happened to the victims was not intentional and he was very sorry. Throughout the interview [Inkelaar] denied any intentional sexual activity with either M.C. or Z.C."

In addition, the trial court allowed the State to introduce evidence of other crimes or civil wrongs pursuant to K.S.A. 60-455. The 60-455 evidence related to accusations that Inkelaar had sexually abused other children. The State introduced testimony from two sisters, B.W. and K.M., who claimed Inkelaar had sexually abused them from the time they were around 7 or 8 years old until they were around 12 or 13 years old. The father of these two alleged victims also testified at trial and was permitted to speak at Inkelaar's sentencing hearing. During the father's trial testimony, he indicated Inkelaar had been his close friend and would babysit his daughters; they would occasionally spend the night at Inkelaar's house. B.W. and K.M. claimed Inkelaar made them watch pornography and paid them money in exchange for sex acts. According to B.W.'s and K.M.'s testimony, Inkelaar engaged in or requested various sex acts over the years, such as sexual intercourse in his bedroom or shower, anal sex, and oral sex. Inkelaar also would engage in breast fondling and vaginal touching with his fingers or mouth, and he would make them touch his penis. Through the testimonies of B.W. and K.M. and their father, the jury learned these incidents had been reported to authorities in 1993 and charges had been brought against Inkelaar but were ultimately dismissed. It was implied the charges were dismissed, in part, because the victims ran away from home due to the trauma of the sexual abuse and the stress of a criminal prosecution.

In addition to presenting the defense of a general denial of any wrongdoing, Inkelaar sought to raise a third-party defense involving A.C. by asserting there were prior allegations that A.C. had sexually abused his children, M.C. and Z.C., when they were 2 and 3 years old, respectively. It was further alleged that A.C. engaged in sexual activity with his younger half-brother a couple of times

when A.C. was a teenager. The trial court did not allow Inkelaar to present this evidence to the jury.

The jury convicted Inkelaar of one count of rape, in violation of K.S.A. 21-3502(a)(2); one count of aggravated indecent liberties with a child, in violation of K.S.A. 21-3504(a)(3)(A); one count of attempted aggravated indecent liberties with a child, in violation of K.S.A. 21-3301 and K.S.A. 21-3504(a)(3)(A); and three counts of aggravated criminal sodomy, in violation of K.S.A. 21-3506(a)(1). The offenses of aggravated indecent liberties and attempted aggravated indecent liberties occurred after the effective date of K.S.A. 21-4643, also known as "Jessica's Law," which increased the severity level for completed and attempted indecent liberties with a child under 14 to an off-grid crime. Inkelaar received a controlling sentence of life imprisonment without possibility of parole for 25 years. He now timely appeals his convictions and sentence.

ISSUE 1: *Did the trial court err by allowing the State to introduce K.S.A. 60-455 evidence to show plan, intent, or absence of mistake or accident?*

First, Inkelaar argues the trial court should not have permitted the State to introduce evidence of other crimes or civil wrongs under K.S.A. 60-455, specifically, Inkelaar's alleged prior sexual abuse of other children. According to Inkelaar, the prior acts were not admissible on the bases given by the trial court, *i.e.*, to prove plan, intent, or absence of mistake or accident. To support this argument, Inkelaar contends intent and absence of mistake or accident "were not material facts at issue in the case," and while he does not challenge the trial court's findings with regard to whether the prior allegations were strikingly similar to show plan, Inkelaar argues evidence of plan, as well as intent and absence of mistake or accident, was more prejudicial than probative.

*Preservation of Issue for Appeal*

As a preliminary matter, the State contends Inkelaar failed to preserve this evidentiary issue for appeal because, according to the State, he failed to lodge a "timely and specific objection" to the admission of the K.S.A. 60-455 evidence. More specifically, the

State argues Inkelaar "did not object on K.S.A. 60-455 grounds during the testimony of the prior victims or their father."

As pointed out by the State, this court has recently emphasized, under K.S.A. 60-404, "a party must lodge a timely and specific objection to the admission or exclusion of evidence in order to preserve the evidentiary question for review." *State v. King*, 288 Kan. 333, 348, 204 P.3d 585 (2009). The goal of the rule requiring a timely and specific objection is to give " ' "the trial court the opportunity to conduct the trial without using the tainted evidence, and thus avoid possible reversal and a new trial" ' [Citation omitted.]" *King*, 288, Kan. at 342. Because an in limine ruling "is subject to change when the case unfolds," *Luce v. United States*, 469 U.S. 38, 41, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984), a pretrial objection must be contemporaneously renewed during trial or preserved through a standing objection. *State v. Berriozabal*, 291 Kan. 568, 580, 243 P.3d 352 (2010).

Contrary to the State's argument, however, Inkelaar preserved this issue by asserting a continuing objection after having voiced specific reasons the evidence was not admissible. The specific reasons the evidence was inadmissible were first articulated in Inkelaar's pretrial motion in limine in which he asked the trial court to exclude "any statement or remark from any witness that Defendant has ever been accused previously of something similar to the accusations in this case with other parties." The issue was also raised when the State filed a competing pretrial motion asking the court to allow it to introduce evidence of prior sexual abuse allegations against Inkelaar. The court reserved ruling on the motion.

Later, during the course of the State's case, outside the presence of the jury, the trial court heard arguments and considered evidence regarding the K.S.A. 60-455 issue. The State's proffer included the testimony of the two alleged prior child victims of Inkelaar's sexual abuse, B.W. and K.M., and the testimony of their father, T.M. Counsel for both sides presented arguments regarding the admissibility of the K.S.A. 60-455 evidence.

The State argued the evidence was admissible to show plan, intent, or absence of mistake or accident. Defense counsel argued the evidence was inadmissible because the concepts of intent and

absence of mistake or accident were not substantially at issue and because there were not sufficient similarities between the current charged acts and the prior sexual abuse to show plan. Further, "[w]ith respect to prejudicial impact, the prejudicial impact cannot be worse." The trial court found the evidence of prior sexual abuse was admissible to show intent and absence of mistake or accident. However, the trial court reserved ruling on whether "plan [was] involved" until the evidence had been submitted. Later, during the jury instruction conference, the trial court found "there were sufficient strikingly similar situations to allow for plan." Thus, the limiting instruction ultimately included "intent, plan, and absence of mistake or accident."

Defense counsel not only objected to the admission of the evidence during the State's proffer, he also voiced two additional objections to the evidence. The first objection was made when the State questioned Detective Werlein regarding her interviews of M.C. and Z.C. The pertinent colloquy began when the prosecutor asked the detective if, during her investigation, she had located and interviewed other possible prior victims of Inkelaar's improper conduct. The detective testified she had located B.W., K.M., and their father, and she had asked B.W. and K.M. about what Inkelaar had allegedly done to them as children. Then, defense counsel stated: "And, Your Honor, just to lodge an objection contemporaneously to that information, if I could." The objection was acknowledged by the trial court and, in context, clearly referenced the "information" to be revealed to the jury during subsequent testimony, *i.e,* the details of the alleged prior sexual abuse of B.W. and K.M.

The second objection came just before the testimony of T.M., B.W., and K.M., which immediately followed the testimony of Detective Werlein. T.M. testified first, and before his direct examination began, defense counsel raised a "continuing objection to this matter," which was acknowledged by the trial court. Although defense counsel raised no objections during B.W.'s or K.M.'s testimony, the standing objection was sufficient to apply to the admissibility of the prior sexual abuse evidence later presented by all three of these witnesses—especially because just shortly before the

testimony of these witnesses was presented to the jury, defense counsel had argued such evidence should be excluded.

These circumstances satisfy the preservation requirement because the pretrial objections were renewed *during* the trial, where the court was able to consider the proffered evidence immediately before it was presented to the jury. And defense counsel took the additional step of lodging a standing objection. See *State v. Houston*, 289 Kan. 252, 271, 213 P.3d 728 (2009) ("In the alternative, counsel should have asked for a continuing objection and thereby eliminated the need for the later trial objection.").

*Applicable Statute/Standards of Review*

Finding that Inkelaar preserved this evidentiary issue for appeal, we begin our discussion with the language of K.S.A. 60-455 and the applicable standards of review.

The version of K.S.A. 60-455 in effect at the time of the alleged crimes and during Inkelaar's trial is as follows:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." K.S.A. 60-455.

It should be noted that the legislature amended the statute effective April 30, 2009. See L. 2009, ch. 103, sec. 12; K.S.A. 2010 Supp. 60-455. Neither party, however, argues the amendment's relevance to the issues before this court. Thus, the amendment will not be discussed.

As provided by K.S.A. 60-455, although evidence of prior crimes or civil wrongs cannot be admitted to prove a criminal defendant's propensity to commit the charged crime, it can be " 'admissible when relevant to prove some other material fact.' " *State v. Garcia*, 285 Kan. 1, 12, 169 P.3d 1069 (2007) (quoting K.S.A. 60-455). Several steps are required in determining whether evidence was properly admitted under the statute. See *State v. Wells*, 289 Kan. 1219, 1226-27, 221 P.3d 561 (2009); *State v. Warledo*, 286 Kan.

927, 940-42, 190 P.3d 937 (2008); *State v. Gunby*, 282 Kan. 39, Syl. ¶ 3, 144 P.3d 647 (2006).

"The court must determine that the fact to be proven is material, *e.g.*, concerning intent, motive, knowledge, or identity. In other words, the court must determine whether the fact ' "has a legitimate and effective bearing on the decision of the case." ' *State v. Garcia*, 285 Kan. 1, 14, 169 P.3d 1069 (2007). Our standard of review for materiality is de novo. *State v. Reid*, 286 Kan. 494, 505, 186 P.3d 713 (2008).

"The court must also determine whether the material fact is disputed. *Reid*, 286 Kan. at 505; *Garcia*, 285 Kan. at 14 (' "[T]he element or elements being considered . . . must be substantially at issue in the case." '). The court must also determine whether the evidence is relevant to prove the disputed material fact, *i.e.*, whether it has 'any tendency in reason to prove' that fact. K.S.A. 60-401(b); *Reid*, 286 Kan. at 505. This court reviews relevance—in particular, the probative element of 60-455—for abuse of discretion. *Reid*, 286 Kan. at 507.

"The court must next determine whether the probative value of the evidence outweighs the potential for producing undue prejudice. *Reid*, 286 Kan. at 503. Our standard for reviewing this determination is also abuse of discretion. *Reid*, 286 Kan. at 512 (citing *Garcia*, 285 Kan. at 18). Finally, if the presented evidence meets all of these requirements, then the trial court must give a limiting instruction 'informing the jury of the specific purpose for [the evidence's] admission.' *Garcia*, 285 Kan. at 12." *State v. Hollingsworth*, 289 Kan. 1250, 1258, 221 P.3d 1122 (2009).

*Plan*

One basis on which the trial court admitted evidence of Inkelaar's alleged prior sexual abuse of other children was to prove plan under K.S.A. 60-455. Inkelaar, in his appellate brief, concedes the evidence of prior sexual abuse was admissible to show plan, acknowledging the "evidence of the nature of the crimes, the general age of the victims, provision of gifts in exchange for sexual favors, and use of pornography before or during sexual acts" constitute factors establishing a "similar pattern of conduct." Thus, Inkelaar has abandoned any arguments regarding the *relevance* of the K.S.A. 60-455 evidence to prove plan. See *Berriozabal*, 291 Kan. at 594 (party must present argument and support that argument with pertinent authority or show why the argument is sound despite a lack of supporting authority or in the face of contrary authority; otherwise, the argument will be deemed abandoned).

Inkelaar takes issue solely with the trial court's finding that the probative value of the evidence of plan outweighed the prejudicial effect. He contends the presentation of such "inflammatory" evidence was unduly prejudicial because it "focused the jury on what may have occurred in the past and distracted the jury from a critical review of the credibility of M.C. and Z.C.'s allegations."

The question of whether evidence is unduly prejudicial is determined by whether its probative value is outweighed by undue prejudice. See *Reid*, 286 Kan. at 503. Evidence of other crimes or civil wrongs is unduly prejudicial when it " ' "actually or probably brings about the wrong result under the circumstances of the case." ' [Citation omitted.]" *Hollingsworth*, 289 Kan. at 1259. On appeal, the trial court's assessment of this question is reviewed for abuse of discretion. The burden of proof is on the party alleging the court's discretion was abused. *Garcia*, 285 Kan. at 18-19. Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011).

Applying this standard, we conclude the trial court did not abuse its discretion when it determined the evidence of the alleged prior crimes was not unduly prejudicial, *i.e.*, it would not bring about the wrong result. First, the prior crimes evidence was brought into question by the testimony of Inkelaar's ex-wife, who testified one of the alleged prior victims told her the allegations made by B.W. and K.M. against Inkelaar were false. Second, although Inkelaar focuses on the potential for undue sympathy for M.C. and Z.C., the jury was instructed it could only consider the evidence for the purposes stated in the instruction, and we presume the jury followed the instruction. See *State v. Becker*, 290 Kan. 842, 856, 235 P.3d 424 (2010). Third, although there were some inconsistencies in the statements of M.C. and Z.C., the evidence against Inkelaar was strong. Further, M.C. and Z.C. were consistent in most ma-

terial respects when retelling their accounts to their father, step-mother, and law enforcement officers. Finally and most significantly, the evidence was highly probative because the alleged prior crimes were strikingly similar to the circumstances described by M.C. and Z.C. The prior crimes testimony indicated Inkelaar was close friends with the father of B.W. and K.M., just as he was with A.C. While babysitting, Inkelaar would sexually abuse B.W. and K.M. in his bedroom, in the shower, or in the living room while siblings were outside playing or were sleeping.

### Intent and Absence of Mistake or Accident

Because we determine the evidence was admissible on the basis of plan, we need not consider Inkelaar's arguments regarding the propriety of admitting the evidence to prove intent or the absence of mistake or accident. Even if the admission on those grounds was erroneous, the evidence was properly before the jury. The only potential prejudice would be because of including the additional grounds in the limiting instruction.

This court has held "[a]n overbroad limiting instruction on K.S.A. 60-455 evidence will be deemed harmless error if the defendant was not prejudiced by the inclusion of more material facts than were warranted by the evidence in the case." *State v. Edwards*, 291 Kan. 532, Syl. ¶ 11, 243 P.3d 683 (2010). We discern no basis for the additional factors to have caused jury confusion or other prejudice in this case, and the instruction, even if overly broad, instructed the jury it could not infer guilt merely because of Inkelaar's disposition to commit crimes. We conclude that even if error occurred, it was harmless because there is not a reasonable probability the error affected the outcome of the trial. See *Ward*, 292 Kan. at 564-65 (under harmless error test of K.S.A. 60-261 and K.S.A. 60-2105 appellate court must be persuaded there is no reasonable probability error affected the outcome of the trial).

ISSUE 2: *Did the prosecutor commit misconduct during cross-examination of the defendant's brother?*

Next, Inkelaar contends the prosecutor committed misconduct during cross-examination of his brother, Tyrone, who testified on

behalf of the defense. The procedural background of the argument is that K.M., one of the victims of Inkelaar's alleged prior sexual abuse, indicated she had also been sexually assaulted by Tyrone. During cross-examination of Tyrone, the prosecutor questioned Tyrone about the statute of limitations on the prosecution of these prior acts. Because the alleged acts of Inkelaar and Tyrone involving K.M. occurred during the same time frame, Inkelaar now argues for the first time on appeal that the prosecutor's questions about the statute of limitations "clearly signaled to the jury that the State believed the law precluded prosecution of [Inkelaar] for his past crimes" against B.W. and K.M. and "encouraged the jury to punish [Inkelaar] in the present case for actions he may have committed in the past."

*Standard of Review*

A two-step analysis applies to Inkelaar's claim of prosecutorial misconduct:

" 'In general, appellate review of an allegation of prosecutorial misconduct involving improper comments to the jury follows a two-step analysis. First, the appellate court decides whether the comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, the appellate court decides whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. [Citation omitted.]

" 'In the second step of the two-step analysis, the appellate court considers three factors: "(1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling." ' " *State v. Adams*, 292 Kan. 60, 66, 253 P.3d 5 (2011).

See *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 (2004).

*Preservation of Issue*

The State presents a preliminary argument regarding whether Inkelaar preserved this issue. The State concedes the defense counsel objected to the statute of limitations questions on several grounds, including that the questions were not relevant, they called for legal conclusions, they assumed facts not in evidence, and they failed to fully state the law. Nevertheless, the State complains In-

kelaar failed to specifically raise the issue of prosecutorial misconduct at trial. The basis for the State's argument is the rule that a party cannot object to the introduction of evidence on one ground at trial and then assert another ground on appeal. *State v. McCaslin*, 291 Kan. 697, Syl. ¶ 5, 245 P.3d 1030 (2011); *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 (2010).

Here, however, the defense raised the evidentiary objections required by K.S.A. 60-404. Prosecutorial misconduct is not itself an evidentiary objection, but misconduct may occur when a prosecutor asks a question for which the prosecutor has no reason to believe there is a foundation of fact or law. See *State v. White*, 284 Kan. 333, 340-44, 161 P.3d 208 (2007) (prosecutorial misconduct in the form of inappropriate questioning and argument); see generally 21 Wright and Graham, Federal Practice and Procedure: Evidence § 5042 (2d ed. 2005) (insulating jury from inadmissible evidence). Inkelaar made the evidentiary objections that would serve as the bases for his argument of prosecutorial misconduct, *i.e.*, there was no legal foundation for the questions, by objecting on the grounds the prosecutor did not fully state the law, the questions were based on facts not in evidence, and the questions called for legal conclusions. He now simply argues the error, which he pointed out to the prosecutor and judge by making his objections, should be reversed because the error was more than an evidentiary error, it was prosecutorial misconduct.

Under either an evidentiary analysis or a prosecutorial misconduct analysis, we begin by determining whether the prosecutor's questions were proper. Within the scope of a prosecutorial misconduct analysis, this inquiry would answer whether the questions were within the latitude allowed the prosecutor. Then, in an analytical step unique to prosecutorial misconduct analysis, an appellate court, in determining if the prosecutor's conduct requires reversal, reviews (1) whether the misconduct was gross and flagrant, (2) whether the misconduct showed ill will on the prosecutor's part, and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. *Adams*, 292 Kan. at 66.

We conclude Inkelaar made the necessary evidentiary objections to preserve his current argument of prosecutorial misconduct.

### Step One: Prosecutorial Misconduct

Inkelaar argues misconduct occurred because the prosecutor misrepresented the legal effect of the statute of limitations relevant to the crimes at issue, K.S.A. 21-3106 (recodified at K.S.A. 21-5107, effective July 1, 2011, see L. 2010, ch. 136, sec. 7). At issue are the following questions which the prosecutor asked Inkelaar's brother: "If you were—if you learned that the statute of limitations was five years, would you agree with me, sir, that you could not be brought to trial for that crime?"; "Isn't it true that you can't be brought to trial if the statute of limitation is also five years?"; and "If you were told the statute of limitations for sex crimes was five years, and you were accused of doing this in 1993, isn't it true that you could not be brought to trial for that today?" Inkelaar argues that even though the time limitation is 5 years, there are tolling provisions and exceptions, including an exception relating to crimes against children under the age of 15, if certain specific conditions apply. K.S.A. 21-3106(5)(f) (recodified at K.S.A. 21-5107(e)(6)(A), effective July 1, 2011, see L. 2010, ch. 136, sec. 7). He adds: "The irony of the State's comments was that it had charged Mr. Inkelaar with crimes dating back to 2003, which would have been time barred under the prosecutor's description of a rigid statute of limitations."

We agree the prosecutor's questions were not predicated on an accurate statement of the law and were improper.

### Step Two: Factors

As previously noted, in the second step of the prosecutorial misconduct analysis we consider three factors: (1) whether the misconduct was gross and flagrant, (2) whether the misconduct showed ill will on the prosecutor's part, and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. *Adams*, 292 Kan. at 66.

In assessing whether gross and flagrant conduct has occurred, appellate courts should look to whether the prosecutor "repeated or emphasized the conduct." *State v. Madkins*, 42 Kan. App. 2d 955, 961, 219 P.3d 831 (2009) (citing *State v. Miller*, 284 Kan. 682, 719-20, 163 P.3d 267 [2007]). Similarly, a prosecutor's ill will is usually "reflected through deliberate and repeated misconduct or indifference to a court's rulings." *Madkins*, 42 Kan. App. 2d at 961 (citing *State v. Bunyard*, 281 Kan. 392, 407, 133 P.3d 14 [2006]). Although the prosecutor asked several questions in a row, the statute of limitations questions were not otherwise emphasized in the trial. Further, although the first objection was sustained, when the prosecutor rephrased the question in response to the objection, the trial court overruled all further objections. Consequently, we do not find deliberate misconduct or indifference to the court's rulings.

Turning to the third factor, whether the evidence against the defendant was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of the jurors, in the past we frequently stated the third factor cannot override the first two factors unless we are able to say the harmless error tests of both K.S.A. 60-261 (inconsistent with substantial justice) and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), *reh. denied* 386 U.S. 987 (1967) (conclusion beyond reasonable doubt that the error had little, if any, likelihood of having changed the results of the trial), have been met. See, *e.g.*, *Ward*, 292 Kan. at 549; *Adams*, 292 Kan. at 66; *Tosh*, 278 Kan. at 93.

Our recent opinion in *Ward*, 292 Kan. 541, brought about a modification in this portion of the prosecutorial misconduct standard. *Ward* synthesized our caselaw on harmless error and recognized the same standard applies regardless of whether we are applying an analysis under K.S.A. 60-261 and K.S.A. 60-2105 or *Chapman*. That standard is whether the error affected the substantial rights of the party as measured by whether it affected the outcome of the trial. *Ward*, 292 Kan. at 553-55. The difference between our state statutory standard and the federal constitutional standard is primarily the level of certainty that applies. *Ward*, 292

Kan. at 555-56. (We also reserved a question of whether there is a difference regarding which party has the burden of production when the state statutory standard applies. *Ward*, 292 Kan. at 568-69.) *Ward* recognized that the federal constitutional standard requires the party benefitting from the error to prove beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record. *Ward*, 292 Kan. at 568-69.) In contrast, if the fundamental failure does not infringe upon a constitutional right, an appellate court should apply K.S.A. 60-261 and K.S.A. 60-2105 and determine if there is a reasonable probability the misconduct affected the outcome of the trial. *Ward*, 292 Kan. at 569.

Hence, satisfying the level of certainty imposed by *both* the state and the federal constitutional harmless error standard, as we have required in our past cases, necessarily means the State, as the party who has benefitted from the prosecutorial misconduct, bears the burden to establish beyond a reasonable doubt that the error did not affect the defendant's substantial rights, *i.e.*, there is no reasonable possibility the error affected the verdict. We have adopted this view in several recent decisions. This recognition simply means the third factor cannot override the first two factors unless we are able to say the *Chapman* constitutional error standard has been met. See *State v. Naputi*, 293 Kan. 55, 58, 260 P.3d 86 (2011); *State v. Hall*, 292 Kan. 841, Syl. ¶¶ 14, 15, 257 P.3d 272 (2011); *State v. Hernandez*, 292 Kan. 598, 603-04, 257 P.3d 767 (2011) *State v. Stieben*, 292 Kan. 533, 539, 256 P.3d 796 (2011).

Even though the State's burden is more difficult to meet under this standard than under the state statutory harmless error standard that applied to our analysis of Issue 1, we conclude the State has met its burden. We note that Inkelaar's argument of prejudice is based on inferences that were never argued to the jury; it would require the jury to conclude Inkelaar has not been and will not be prosecuted for these crimes and the sole reason for the lack of prosecution is the bar of the statute of limitations. Even assuming the jury independently connected all of the necessary dots to get to this conclusion, which seems unlikely, evidence was presented that the charges had been brought against Inkelaar for these al-

leged crimes and those charges were subsequently dismissed. The jury was aware one of the victims had recanted her accusations after the charges had been dismissed. Consequently, even if the jurors were to infer there was not or would not be a prosecution against Inkelaar because of his actions relating to K.M. and B.W., they were aware charges had been filed within the statute of limitations. These circumstances weaken any suggestion the jury would be inclined to believe Inkelaar could not be prosecuted because of the statute of limitations or would be inclined to punish Inkelaar for charges the State chose not to prosecute.

More important, there was strong evidence of the crimes against M.C. and Z.C. that was independent of the alleged prior wrongs relating to K.M. and B.W. In addition, M.C. and Z.C. gave consistent statements in most material respects throughout the investigation and at trial. We hold there is no reasonable possibility the questions regarding the statute of limitations affected the verdict in this case.

ISSUE 3: *Did the trial court lack jurisdiction to sentence the defendant under Jessica's Law, K.S.A. 21-4643, because the defendant's age was omitted from the complaint and from the jury instructions?*

Some of Inkelaar's charged crimes, such as those related to sodomy, were alleged to have been committed before the July 2006 effective date of Jessica's Law, K.S.A. 21-4643, but the two offenses charging aggravated indecent liberties with a child were alleged to have been committed after the law's effective date. (On one of these counts, the jury found Inkelaar guilty as charged and, on the other count, he was found guilty of the lesser included offense of attempt.) Jessica's Law requires that a defendant be sentenced to a term of imprisonment for life, with a mandatory minimum term of imprisonment of not less than 25 years, if (1) the crime is committed on or after July 1, 2006, (2) the defendant is 18 years of age or older, and (3) the defendant is convicted of certain sexually violent crimes, including completed and attempted aggravated indecent liberties with a child who is under the age of 14. K.S.A. 21-4643(a)(1)(C), (G).

Inkelaar essentially presents two arguments revolving around the issue of his age. First, he contends the trial court did not have jurisdiction to sentence him under Jessica's Law because the charging document did not state his age at the time of each alleged charge of aggravated indecent liberties with a child. Second, because a defendant's age is an essential element of a Jessica's Law crime, Inkelaar argues the court erred by failing to instruct the jury to find he was 18 years of age or older at the time of each of these offenses. Both contentions are raised for the first time on appeal, and neither contention leads us to the conclusion that reversible error occurred.

*Standard of Review*

Inkelaar's overarching argument addresses jurisdiction, statutory interpretation, and constitutional interpretation; therefore, this court's review is unlimited. See *State v. Martinez*, 290 Kan. 992, 1017, 236 P.3d 481 (2010); *State v. Gonzales*, 289 Kan. 351, 365-66, 212 P.3d 215 (2009); *State v. Bello*, 289 Kan. 191, 195-96, 211 P.3d 139 (2009) (citing *State v. Allen*, 283 Kan. 372, 374, 153 P.3d 488 [2007]; *Foster v. Kansas Dept. of Revenue*, 281 Kan. 368, 369, 130 P.3d 560 [2006]); and *State v. Bryan*, 281 Kan. 157, 159, 190 P.3d 85 [2006]. Separate standards of review apply to the two subissues argued by Inkelaar.

*Complaint*

In the first subissue, Inkelaar challenges whether the complaint was sufficient to confer subject matter jurisdiction. In Counts 6 and 7 of the second amended complaint, Inkelaar was charged with committing aggravated indecent liberties with a child on or about December 1, 2007. As acknowledged by the State in its appellate brief, the complaint identified both counts as violations of K.S.A. 21-3504(a)(3)(A) and as being off-grid felonies but did not specifically allege Inkelaar was 18 years of age or older. It is well established that

"[t]he Sixth Amendment to the United States Constitution gives an accused the right to 'be informed of the nature and cause of the accusation'; the Kansas Constitution Bill of Rights, § 10 mandates that 'the accused shall be allowed . . . to demand the nature and cause of the accusation against him.' Generally, if a com-

plaint fails to include an essential element of a crime charged, it is 'fatally defective, and the trial court lacks jurisdiction to convict the defendant of the alleged offense.' " *Gonzales*, 289 Kan. at 366 (quoting *State v. Moody*, 282 Kan. 181, 197, 144 P.3d 612 [2006]).

This court has repeatedly dealt with the same issue raised by Inkelaar. See, *e.g.*, *State v. Huerta-Alvarez*, 291 Kan. 247, 254-56, 243 P.3d 326 (2010); *Martinez*, 290 Kan. at 1017-18; *Gonzales*, 289 Kan. at 366-70; *Bello*, 289 Kan. at 195-200. A defendant challenging the sufficiency of the charging document for the first time on appeal must show the alleged defect either "(1) prejudiced the defendant's preparation of a defense; (2) impaired the defendant's ability to plead the conviction in any subsequent prosecution; or (3) limited the defendant's substantial rights to a fair trial. [Citation omitted.]" *State v. Gracey*, 288 Kan. 252, 254, 200 P.3d 1275 (2009); see *State v. Hall*, 246 Kan. 728, 765, 793 P.2d 737 (1990), *overruled in part on other grounds by Ferguson v. State*, 276 Kan. 428, 78 P.3d 40 (2003); see also *State v. McElroy*, 281 Kan. 256, 261, 130 P.3d 100 (2006) (applying the post-*Hall* analysis).

Applying this test in *Martinez* and *Gonzales*, for example, this court held the respective defendants were adequately informed of both the crime charged and the penalty. In each case we determined it was sufficient that the complaint listed the defendant's date of birth, stated the charge was for an off-grid person felony, and otherwise specifically listed the elements of the crime—aggravated indecent liberties with a child under the age of 14 in *Gonzales*, 289 Kan. at 369, and rape of a child under 14 years of age in *Martinez*, 290 Kan. at 1018. Further, this court found it significant in both cases that neither defendant contended that the preparation of his defense or his right to a fair trial were impaired. Nor did either defendant show his conviction in question affected any subsequent prosecution. See *Martinez*, 290 Kan. at 1018; *Gonzales*, 289 Kan. at 368-69.

The same conclusions apply in this case. The two amended complaints listed Inkelaar's date of birth (1963), stated the offenses in both aggravated indecent liberties counts were off-grid person felonies, and otherwise listed the elements of aggravated indecent liberties with a child, which was the only Jessica's Law crime at

issue. Further, Inkelaar has not argued the preparation of his defense was impaired. Nor has he shown how his convictions—aggravated indecent liberties with a child and attempted aggravated indecent liberties with a child—have affected any subsequent prosecution or affected his right to a fair trial. Thus, Inkelaar was adequately informed of both the crimes alleged and the penalty proposed. Consequently, we hold this challenge, which is raised for the first time on appeal, fails to make the necessary showing that the trial court had no jurisdiction to sentence Inkelaar for the off-grid offenses.

*Jury Instructions*

Inkelaar's second age-related challenge relates to the trial court's failure to instruct the jury to determine whether Inkelaar was 18 years of age or older at the time of the offenses of aggravated indecent liberties with a child. In raising this issue, Inkelaar relies on several recent decisions involving Jessica's Law in which this court held the failure to allege and instruct on the defendant's age was error under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). See *State v. Morningstar*, 289 Kan. 488, 494-95, 213 P.3d 1045 (2009); *Gonzales*, 289 Kan. at 371; *Bello*, 289 Kan. at 199-200. In those cases, the record contained no evidence on which a jury could have based a finding about the defendant's age, even if the jury was properly instructed. Accordingly, this court remanded the cases for resentencing under the Kansas Sentencing Guidelines Act, K.S.A. 21-4701 *et seq.*, rather than under the off-grid sentencing provisions required by Jessica's Law. Inkelaar seeks the same sentencing relief in this appeal.

But, as aptly noted by the State in its letter of additional authority under Supreme Court Rule 6.09(b) (2010 Kan. Ct. R. Annot. 48), this court subsequently considered, in *State v. Reyna*, 290 Kan. 666, 234 P.3d 761, *cert. denied* 562 U.S. 1014 (2010), whether the failure to instruct the jury on this element of the crime was harmless error when the trial record contained evidence of the defendant's age that would have permitted the jury to make the appropriate finding, if properly instructed to do so. In doing so, this court

applied the federal constitutional harmless error standard of *Chapman*, 386 U.S. 18, stating: "[T]his court will apply the harmless error analysis to the omission of an element from the instructions to the jury when a review of the evidence leads to the conclusion beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." *Reyna,* 290 Kan. at 681 (citing *Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 [2006], and *Neder v. United States*, 527 U.S. 1, 119 S. Ct. 1827, 144 L. Ed. 2d 35 [1999]). Other cases have followed suit. See, *e.g., State v. Race*, 293 Kan. 69, 259 P.3d 707 (2011); *Martinez*, 290 Kan. at 1019; *State v. Garza*, 290 Kan. 1021, 1031-32, 236 P.3d 501 (2010); *State v. Colston*, 290 Kan. 952, Syl. ¶¶ 12, 13, 235 P.3d 1234 (2010).

Our recent discussion of the federal constitutional harmless error standard in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), reaffirms this standard must be applied to an *Apprendi* based, *i.e.,* a federal Constitution based, error. See *Ward*, 292 Kan. at 567 (citing *Gamache v. California*, 562 U.S. 1083, 131 S. Ct. 591, 178 L. Ed. 2d 514 [2010], to explain that states must apply federal harmless error standard when reviewing claims under the United States Constitution). Further, we note this standard is equivalent to the standard this court applies to any claim of instructional error where no objection has been made at trial. Compare *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353, *reh. denied* 508 U.S. 968 (1993) (quoting *Chapman*, 386 U.S. at 24, and explaining *Chapman* standard means relief from error is required "merely because there is a ' "reasonable possibility" ' that trial error contributed to the verdict"), with *State v. Bailey*, 292 Kan. 449, 455, 255 P.3d 19 (2011) (explaining K.S.A. 22-3414[3] requires party who fails to object to jury instruction to establish jury instruction is "clearly erroneous," which means reviewing court must be " 'firmly convinced there is a real possibility the jury would have rendered a different verdict if the error had not occurred' ").

Applying the federal constitutional harmless error standard in *Reyna* and several subsequent cases, we determined the failure to

instruct the jury regarding the element of the defendant's age did not require reversal of the defendant's Jessica's Law conviction. In *Reyna,* the defendant testified at trial and stated his own age. *Reyna,* 290 Kan. at 679. Similarly in *Colston,* sufficient evidence of the defendant's age was presented through testimony of his son who was 29 years old and who testified he had a sister who was also the defendant's child and who was 31. In addition, Colston's girlfriend testified she was 31 years old and Colston was about 20 years older. *Colston,* 290 Kan. at 974. In both cases, this court determined there was sufficient evidence in the record establishing the defendant's age such that any instructional error was harmless.

In Inkelaar's case, evidence of Inkelaar's age was presented to the jury. Inkelaar did not testify in his own defense, but Detective Riddle testified Inkelaar was born in 1963. And the detective confirmed Inkelaar was over 18 years of age at the time of the December 5, 2007, police interview. Additionally, Tyrone testified he was 39 years old at the time of trial and Inkelaar was 6 to 8 years older. T.M. testified he was 46 years old at the time of trial and had attended junior high and high school with Inkelaar, who entered military service shortly after high school. M.C. testified Inkelaar had "been my dad's friend for, I think, 28 years or so."

We conclude beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error. Consequently, the error in failing to instruct the jury regarding Inkelaar's age was harmless. Accordingly, we affirm Inkelaar's off-grid sentences under Jessica's Law.

ISSUE 4: *Did the trial court abuse its discretion by excluding evidence of third-party guilt?*

For Inkelaar's final argument, he contends the trial court deprived him of his right to present a defense by denying his request to introduce evidence of a third party's guilt. Inkelaar specifically complains about the court's refusal to permit evidence of prior sexual abuse allegations against A.C., the father of the victims in this case. This contention lacks merit.

*Standard of Review*

A trial court's decision under the third-party evidence rule at the heart of the evidentiary question before this court is subject to an abuse of discretion standard of review on appeal. See *State v. Marsh*, 278 Kan. 520, 531, 102 P.3d 445 (2004), *rev'd on other grounds Kansas v. Marsh*, 548 U.S. 163, 123 S. Ct. 2516, 165 L. Ed. 2d 429 (2006). This standard of review places the burden of proof on appeal on the party alleging that such an abuse of discretion occurred. *State v. Brown*, 285 Kan. 261, 303, 173 P.3d 612 (2007); *State v. Trotter*, 280 Kan. 800, 810, 127 P.3d 972 (2006). The trial court's decision may be an abuse of discretion if the decision does not rest on considerations imposed by prior case law, *i.e.*, is based on an error of law. See *Ward*, 292 Kan. at 550 (discretion is abused if decision [1] is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; [2] is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or [3] is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based); *State v. Goodson*, 281 Kan. 913, 922, 135 P.3d 1116 (2006) (trial court's discretion must be guided by the considerations imposed by prior case law).

During the cross-examination of A.C., when he was testifying about his children's allegations against Inkelaar in this case, defense counsel asked A.C. whether he had ever "been accused of anything like this." The trial court sustained the State's objection based on relevance. Then, outside the presence of the jury, defense counsel moved to present evidence of prior allegations against A.C. by his younger half-brother, J.B. The trial judge initially stated: "If it doesn't involve these particular children, I don't believe it's admissible." The court further indicated it appeared as if defense counsel was engaging in a "fishing expedition" and refused to allow Inkelaar to pursue the matter during A.C.'s cross-examination. The court did indicate it would review the matter if the defense presented a brief on the issue.

The next day, outside the presence of the jury, defense counsel proffered testimony from J.B. The proffer stated that J.B. would

testify A.C. raped him on one occasion, and on another occasion forced J.B. and a cousin to perform oral sex upon him. According to J.B., A.C. was a teenager at the time and J.B. was in "grade school" and was at least 10 years old. He testified this happened before M.C. and Z.C. were born.

Before the jury returned to the courtroom, defense counsel also told the court he had additional information, in the form of medical records, suggesting A.C. had allegedly sexually abused M.C. and Z.C. when they were 2 and 3 years old, respectively. The information indicated A.C.'s ex-wife, J.M., the biological mother of M.C. and Z.C., had reported the alleged abuse. The trial court withheld a ruling on the admissibility of this third-party guilt evidence in order to give defense counsel a chance to locate J.M. As for the evidence involving J.B.'s allegations of sexual abuse by A.C., the trial court found it was "very remote in time."

The following day, defense counsel was permitted to proffer the testimony of J.M. Outside the presence of the jury, J.M. testified that in 2001, 2-year-old M.C. told her A.C. "whipped out his weenie and wanted her to suck it." J.M. said she was bathing M.C. and noticed "bruises on her behind." J.M. testified she took M.C. to the hospital, a nurse "checked her out," and "SRS investigated" the matter. When asked if Z.C. ever indicated his father had touched his "wee-wee," J.M. testified, "Not to my knowledge, no."

Defense counsel argued both J.B. and J.M. should be allowed to testify "as defendant's claim of third-party defense." Defense counsel explained to the trial court: "We're asking the jury to consider evidence that a third party [A.C.] . . . has a strong motivation to try and make sure that [Inkelaar] is the person that is taken to Court for these things so that he himself can avoid possible prosecution." The court considered and excluded the evidence under the third-party evidence rule.

*Third-Party Evidence Rule*

Generally, evidence of the motive of a third party to commit the crime, standing alone, is not relevant, but such evidence may be relevant if there is other evidence connecting the third party to the crime. The trial court must evaluate the totality of facts and cir-

cumstances in a given case to determine whether the defense's proffered evidence effectively connects the third party to the crime charged. *Brown*, 285 Kan. at 303-04.

Inkelaar argues the third-party evidence in this case is "analogous" to the third-party evidence in *Marsh*, 278 Kan. 520, and *State v. Evans*, 275 Kan. 95, 62 P.3d 220 (2003). (Although *Marsh* was reversed by the United States Supreme Court as to the death penalty issue presented in the case, this court has explained that *Marsh* remains good law as to the third-party evidence rule. See, *e.g.*, *Brown*, 285 Kan. at 303.) In *Marsh*, this court made it clear the admission of third-party evidence does *not* turn on the sometimes hazy distinction between direct and circumstantial evidence. In that case, Marsh was accused of killing a mother and her child, but there was also evidence a third party, who was the husband and father of the victims, might have been involved. The *Marsh* court found the defendant had proffered more than mere evidence of the husband's motive, in part because there was evidence of a mixture of the husband's blood and the blood of one of the victims on Marsh's shoes. As a result, this court held Marsh's right to a fair trial had been violated by the trial court's exclusion of the third-party evidence. *Marsh*, 278 Kan. at 533.

In *Evans*, the defendant tried to admit evidence that another person was seen holding the murder weapon immediately after the fatal shot was fired. *Evans*, 275 Kan. at 105-06. There was also evidence that a third party admitted to the shooting and later dumped the body. This court held the trial court erred in not admitting the third-party evidence. *Evans*, 275 Kan. at 106.

Hence, in both cases there was evidence linking the third party to the crime. In contrast, in this case there is no evidence that A.C. could have committed the crimes charged against Inkelaar. In this regard, this case is more like *State v. Adams*, 280 Kan. 494, 505, 124 P.3d 19 (2005).

In *Adams*, the defendant was charged with the death of a small child in a shaken baby scenario. Adams tried to admit evidence establishing the child's mother had abused one of her daughters from a previous marriage and the divorce decree from that marriage gave her only supervised visits with the children. Adams was

trying to use this evidence in conjunction with evidence of the mother's aggressive actions toward the child in the weeks before the death to prove the mother caused the child's death. This court determined these facts were distinguishable from those in *Marsh* or *Evans* in that none of the evidence proffered by Adams could place the mother at the crime scene at the time relevant to the child's injuries or death. *Adams*, 280 Kan. at 506-07. Without such evidence, the *Adams* court found the defendant's "effort to pin blame on [the mother] amounted to baseless innuendo. In such a situation, the district judge's decision to exclude [the evidence] did not qualify as an abuse of discretion." *Adams*, 280 Kan. at 507; see *State v. Hooker*, 271 Kan. 52, 64-66, 21 P.3d 964 (2001) (trial court did not err in excluding as hearsay proffered testimony that two other people had threatened to harm murder victim, where defendant failed to provide any evidence to connect the two other persons with victim's death and the State connected defendant with victim's murder through eyewitness testimony).

Similarly, in this case, none of the evidence proffered by the defense connected A.C. to the charged crimes. The allegations involving A.C.'s half-brother did not involve the victims in this case and are alleged to have occurred before the victims were even born. As for the allegations of A.C.'s sexual abuse of the victims, according to the proffered evidence, J.M. reported the alleged incidents occurred when the children were ages 2 and 3 years old, respectively. As observed by the trial court, the alleged sexual abuse in the present case did not begin until approximately 2 years after those prior acts, when M.C. was 4 years old. The incidents that led to the report of abuse—on or about November 30 to December 2, 2007—occurred while the children were staying with Inkelaar and A.C. was out of town. Finally, as the trial court pointed out, both children only identified Inkelaar as the perpetrator of the sex acts in this case.

In summary, there is nothing tying A.C. to the charged crimes. Inkelaar's attempt to show third-party guilt falls short, and we hold the trial court did not abuse its discretion in denying the admission of the evidence.

Affirmed.

* * *

JOHNSON, J., concurring in part and dissenting in part: I agree with the majority's ultimate decision to review the K.S.A. 60-455 evidentiary issue. However, given the majority's extended discussion on the preservation of the issue, I want to confirm that I do not read the plain language of K.S.A. 60-404 as requiring a defendant to reassert his or her objection to the admission of specific evidence after the district court has unequivocally ruled that the particular evidence is admissible. See *State v. Hollingsworth,* 289 Kan. 1250, 1260-61, 221 P.3d 1122 (2009) (Johnson, J., dissenting). In other words, once the district court rules that certain evidence is admissible, K.S.A. 60-404 does not require the defendant to, in essence, move for a reconsideration of the court's evidentiary ruling each and every time a witness refers to the judicially admitted evidence. Such a requirement, if it exists, is judicially manufactured and, in my view, unsupportable.

The majority apparently justifies its serial objection requirement on the possibility that the evidence at trial will unfold differently than it did at the pretrial hearing. I submit that there is a much less draconian solution to that potentiality. An appellate court presented with a defendant's challenge to the district court's pretrial ruling allowing the admission of contested evidence where the defendant did not reassert an objection at trial could simply review the matter on the basis of the evidence presented at the pretrial hearing. In other words, the defendant must have reasserted his or her objection at trial and requested a reconsideration of the court's pretrial ruling in order to get an appellate review based upon the evidence presented at trial. In that manner, the defendant gets an appellate review of the precise ruling that he or she asked the district court to make, and the district court cannot be overruled based upon evidence that the court did not consider in making its ruling. On the other hand, the defense is relieved of the hypertechnical requirement that it engage in acts of futility to preserve a challenge to a ruling that has been made explicitly clear to everyone involved with the case.

Moving on to the principal purpose for my separate writing, I am still firmly convinced that sentencing a person for a crime for which the person was neither charged by the State nor convicted by the jury is just plain wrong—constitutionally, statutorily, jurisdictionally, and morally wrong. *Cf. State v. Reyna,* 290 Kan. 666, 690-95, 234 P.3d 761, *cert. denied* 562 U.S. 1014 (2010) (Johnson, J., dissenting); *State v. Garza,* 290 Kan. 1021, 1036-37, 236 P.3d 501 (2010) (Johnson, J., dissenting).

Ironically, the majority makes the point that the constitutional and jurisdictional aspects are well-settled law. Quoting from *State v. Gonzales,* 289 Kan. 351, 366, 212 P.3d 215 (2009), the majority acknowledges that the state and federal constitutions require sufficient clarity in the charging document so that the accused is informed of the nature and cause of the accusation. The complaint in this case contained the elements which would constitute the severity level 3 version of aggravated indecent liberties with a child. See K.S.A. 21-3504(c). The majority points to that circumstance—*i.e.,* where the complaint *"otherwise* specifically listed the elements of the crime"—as being sufficient to adequately inform the defendant that he was being charged with the off-grid Jessica's Law version of the offense. I confess that I am confused by that logic. For instance, if a complaint contained the elements for second-degree intentional murder, I would not opine that it adequately informed the defendant that he or she could be sentenced for premeditated first-degree murder because, even though the complaint omitted the premeditation element, it *otherwise* specifically listed the elements of intentional murder. To the contrary, it is more misleading to a defendant where the elements listed in the complaint constitute all of the elements of a lesser version of a crime, than where the listed elements are incomplete to charge any crime. I would not find that the complaint in this case passed constitutional muster with respect to the off-grid version of the crime.

The *Gonzales* quote selected by the majority also recites that a complaint that fails to include an essential element of the crime charged is " 'fatally defective, and the trial court lacks jurisdiction to convict the defendant of the alleged offense.' " 289 Kan. at 366

(quoting *State v. Moody*, 282 Kan. 181, 197, 144 P.3d 612 [2006]). There is no question that the complaint in this case failed to include an essential element of the off-grid version of aggravated indecent liberties with a child—that the defendant was age 18 or older. Accordingly, the district court lacked subject matter jurisdiction to convict Inkelaar of the Jessica's Law off-grid version of the crime. Given that the district court lacked jurisdiction, there is no basis for us to exercise jurisdiction and declare Inkelaar guilty of the uncharged crime. See *State v. McCoin*, 278 Kan. 465, Syl. ¶ 2, 101 P.3d 1204 (2004) ("If the district court's order was entered without jurisdiction, then an appellate court does not acquire jurisdiction on appeal.").

The majority notes that Inkelaar raises the charging document issue for the first time on appeal and, therefore, it employs the post-*Hall* analysis of essentially determining whether the defendant has been prejudiced by the defective complaint. I cannot square that approach with the rather fundamental principle that subject matter jurisdiction may be raised at any time, whether for the first time on appeal or even on the appellate court's own motion. *State v. Sales*, 290 Kan. 130, 135, 224 P.3d 546 (2010). Moreover, a party's failure to challenge a district court's jurisdiction cannot create subject matter jurisdiction where it did not already exist. *State v. Hoffman*, 45 Kan. App. 2d 272, 275, 246 P.3d 992 (2011) (parties cannot confer subject matter jurisdiction by consent, waiver, or estoppel; a failure to object to the court's jurisdiction does not invest the court with the requisite subject matter jurisdiction). Indeed, as the majority's author very recently declared: "An appellate court has no authority to create equitable exceptions to jurisdictional requirements." *Board of Sedgwick County Comm'rs v. City of Park City*, 293 Kan. 107, Syl. ¶ 3, 260 P.3d 387 (2011). Accordingly, we lack subject matter jurisdiction to engage in fact-finding to determine Inkelaar's guilt as to the off-grid severity level of aggravated indecent liberties with a child.

Next, I would add that there is a statutory mandate, omitted from the majority's analysis, which provides that "[u]pon prosecution for a crime, the defendant may be convicted of either the crime charged or a lesser included crime, but not both." K.S.A. 21-

3107(2). The statute does not permit the defendant to be convicted of a *greater* degree of the crime charged.

Finally, it simply offends ones innate notion of fair play to have a defendant charged with a specific crime, defend against that crime, and be convicted by the jury of that crime, but then allow the sentencing judge to impose the sentence for a crime of greater severity. If a person test-drove, selected, and took title to a sub-compact automobile, we would not allow a judge to make an after-the-fact order requiring the purchaser to pay the dealership the sticker price on the most expensive luxury model on the lot. I see no difference here and I would not permit it to happen.